UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
BOARD OF MANAGERS OF SOHO
INTERNATIONAL ARTS CONDOMINIUM,
on behalf of itself and all unit
owners of the Soho International
Arts Condominium,

        Plaintiff,

                                   01 Civ. 1226 (DAB)

      -v-                    ____   OPINION

CITY OF NEW YORK, NEW YORK CITY
LANDMARKS PRESERVATION COMMISSION,
and FORREST MYERS,

        Defendants.
----------------------------------X
DEBORAH A. BATTS, United States District Judge.

    A bench trial[1] was held in this matter on March 15, 16 and 18,

2005.  The factual background of this dispute has been set forth

fully in the Court's prior Opinions on summary judgment motions in

Board of Managers v. City of New York, et al., No. 01 Civ. 1226,

2003 WL 21403333 (S.D.N.Y. June 17, 2003) ("Board I"), and Board of

Managers v. City of New York, et al., No. 01 Civ. 1226, 2004 WL

1982520 (S.D.N.Y. Sept. 8, 2004) ("Board III"),[2] and will not be

_____

    [1] Plaintiff initially requested a jury trial.  However, by
letter dated October 20, 2004, Plaintiff withdrew that request
and consented to a bench trial.  Accordingly, the Court scheduled
a bench trial on the merits of the remaining claims.  The
standard of proof in a civil trial is preponderance of the
evidence.  As in all bench trials, it is the Court that makes
findings of fact and conclusions of law.

    [2] The Court issued a decision, Board of Managers v. City of
New York, et al., No. 01 Civ. 1226, 2003 WL 21767653 (S.D.N.Y.
July 31, 2003) ("Board II"), on motions for reconsideration by

repeated here.  The two issues before the Court are the question of
ownership as it affects the Fourteenth Amendment takings argument
of Plaintiff, and whether or not the removal of the work of art
(the "Work") from the wall of the building located at 599 Broadway,
destroyed it for purposes of the Visual Artists Rights Act
("VARA"), 17 U.S.C. § 101, <u>et</u> <u>seq</u>.[3]  What is not before the Court

_____

Plaintiff and Defendant Myers of the Court's decision in Board I.

[3]  Counsel for Defendant Myers made an argument at trial
that Defendant Myers has VARA rights under 17 U.S.C. §
106A(d)(2).  Defendant Myers' argument is essentially that he has
VARA rights because the Work was created before the effective
date of VARA and title was never transferred from the author of
work of art because he, Defendant Myers, never had title.
Defendant Myers provides no legal support for this argument.

Defendant Myers' interpretation of the statutory provision
stretches the plain meaning of the statute and would seem to
broaden significantly the scope of § 106A(d)(2).  The Court
interprets the statute as requiring the author to hold title to
the work of art in order for § 106A(d)(2) to apply.  <u>See also</u>
<u>Martin v. City of Indianapolis</u>, 982 F.Supp. 625, 638 (S.D. Ind.
1997) ("VARA protection extends to those works of visual art
created prior to the effective date in which title was held by
the author as of that date.") (citing § 106A(d)(2)).  Because
Defendant Myers never had title to the Work, § 106A(d)(2) does
not apply to him.

Plaintiff also submitted a new VARA argument in its pre-
trial submissions and at the bench trial.  Plaintiff argues that
Defendant Myers has no rights under VARA because the Work does
not fall within VARA's definition of a "work of visual art."
Plaintiff cites 17 U.S.C. § 101 which excludes from the
definition of a "work of visual art" "(C) any work not subject to
copyright protection under this title."  However, according to 17
U.S.C. § 411, a registered copyright claim is not required for
actions brought for violations of the rights of the author under
17 U.S.C. § 106A.  Congress amended § 411 so that registration

is whether or not the Landmarks Preservation Commission

("Commission") ruled properly when it directed Plaintiff to

reinstall the Work after the approved repairs to the wall had been

made.[4]

---

would not be a prerequisite to file a suit for violations of §
106A.  (See H.R. Rep. 101-514, 1990 U.S.C.C.A.N. 6915, 6932)
(quoting Prof. Jane Ginsburg of Columbia Law School:  "moral
rights are particularly inapt subject matter for imposition of
formalities.  Moral rights claims go to creators' reputations,
not to rights of economic exploitation.").  Defendant Myers'
first counterclaim asserts a violation of 17 U.S.C. § 106A;
therefore copyright registration of the Work is not required.

[4]  Counsel for Defendant Myers stated in his opening that
"in your Honor's September ruling of last year you have indicated
that in fact the city has the right to so order that to be done,
that the city has the right to order the owner to put [the Work]
back."  (Trans. of Mar. 15, 2006, at 28.)

In its Complaint, Plaintiff brought a claim for relief under
New York CPLR Article 78 to annul and set aside the Landmarks
Preservation Commission's refusal to permit Plaintiff to remove
the Work, and its requirement that Plaintiff restore or replicate
the Work after the northern wall of the building is
rehabilitated.  (Compl. ¶¶ 71-75.)

The Court did state in Board III that the Commission's
denial of a Certificate of Appropriateness to remove the Work
permanently and to mandate that it be reinstalled did not violate
the First Amendment, 2004 WL 1982520, at *16, and also stated
that "[i]t is clear to the Court that by the Commission's
determinations, the Board cannot permanently remove the Work and
must reinstall it."  Id., at *19.  However, the Court did not
rule on the lawfulness of the Commission's determination.  The
Court declined to exercise supplemental jurisdiction over the
Article 78 claim, stating that "[t]he Article 78 proceeding is a
unique state procedural law best left to the expertise of the
state courts, the very places where the state legislature
intended such actions to be tried."  Id., at *28.

By permission of the Court, City Defendants and Plaintiff submitted post-trial memoranda on April 7, 2005.[5]

## I.  Applicability of VARA

In Board I, the Court denied both Plaintiff Board's and Defendant Myers' motions for summary judgment on whether Defendant Myers had rights under VARA pursuant to 17 U.S.C. § 106A(a).  This was because the evidence before the Court in Board I did not address the impact of the removal of the Work.  Specifically, 17 U.S.C. § 113(d)(2) applies if the Work could be removed without

---

As the Court noted in footnote 19 of Board III, the statute of limitations to file an Article 78 proceeding had not expired when it issued its Opinion in Board III.

[5]  Defendant Myers also submitted a post-trial memorandum of law.

The Court was explicit in its instruction that the Court would not entertain post-trial memoranda of law.  (Trans. of Mar. 16, 2005, at 302.)  However, after both Plaintiff and City Defendants raised new arguments in their closing statements, the Court permitted Plaintiff and City Defendants to respond to those new arguments.  (Trans. of Mar. 18, 2005, at 359.)  Defendant Myers' post-trial memorandum contains no responses to new arguments raised by Plaintiff at trial.  Nevertheless, the Court has reviewed Myers' post-trial submission and finds that he does not raise any new points that were not raised in prior submissions or at the bench trial.

City Defendants submitted two post-trial memoranda –- one on March 18, 2005 and another on April 7, 2005.  The first will be referred to as City Defs.' Mem. of Law I, and the second as City Defs.' Mem. of Law II.

4

destroying it and 17 U.S.C. § 113(d)(1) applies if removal of the

Work destroyed it.[6]

In his opening statement at trial, counsel for Defendant Myers

_____

[6]  17 U.S.C. § 113(d)(1)-(2) reads as follows:

(1)  In a case in which -

(A) a work of visual art has been incorporated in or
made part of a building in such a way that removing the
work from the building will cause the destruction,
distortion, mutilation, or other modification of the
work as described in section 106A(a)(3) and

(B) the author consented to the installation of the
work in the building either before the effective date
[6/19/91] set forth in . . . the Visual Rights Act or
in a written instrument executed on or after such
effective date that is signed by the owner of the
building and the author and that specifies that
installation of the work may subject the work to
destruction, distortion, mutilation, or other
modification, by reason of its removal, then the rights
conferred by paragraphs (2) and (3) of section 106A(a)
shall not apply.

(2)  If the owner of a building wishes to remove a work of
visual art which is part of such building and which can be
removed from the building without the destruction,
distortion, mutilation, or other modification of the work as
described in section 106A(a)(3), the author's rights under
paragraphs (2) and (3) of section 106(a)(3) shall apply
unless

(A) the owner has made a diligent, good faith attempt
without success to notify the author of the owner's
intended action affecting the visual art, or

(B) the owner did provide such notice in writing and
the person so notified failed, within 90 days after
receiving such notice, either to remove the work or to
pay for its removal.

said, "The work is down at this point which means on some level, yes it has been destroyed." (Trans. of Mar. 15, 2005, at 12-13.) At the trial, Defendant Forrest Myers himself stated that the Work does not exist at this time:

> Q: And is it therefore your view that once you take these pieces of metal off the building's wall, the artwork is destroyed unless you put them back on that very same wall? Is that your view?
>
> A: Yes, the artwork does not exist right now.
>
> [ . . . . ]
>
> Q: Is it your view that it does not exist at this time?
>
> A: It does not.
>
> Q: Is it your view that it has been destroyed or would you characterize it differently?
>
> A: You know, it is not permanently destroyed.
>
> Q: Would you explain what you mean?
>
> A: Well, I mean that it can be put back up. And the Landmarks expects them to do that.

(Trans. of Mar. 16, 2005, at 208-09, 218.)

Professor Krauss, Defendant Myers' expert witness made similar statements on direct examination:

> Q: You are aware, of course, that the work is temporarily removed, correct?
>
> A: It's been disbanded, yes.
>
> Q: Would it be correct to say that it's been destroyed? Or would there be another --

A:  I think in most cases --

Q:  -- way to describe that?

A.  -- if you disband a work you do destroy it.  I'm thinking,
for instance, the kind of work that I would see as an analogy
to this would be the kind of works called collage in which
Picasso and Braque took bits of printed pieces of paper and
glued them together in order to make a meaningful work of art.
And if you pulled those things apart, you would destroy that
work.  So, by disbanding Mr. Myers' work I think it is
certainly on the way to being destroyed.  It hasn't been
ground up, it hasn't been, you know, thrown in the trash yet
but by disbanding it, yes, it's destroyed.

[ . . . . ]

Q:  . . . Are you aware of the component parts of Mr. Myers'
work?

A:  Yes, I am.

Q:  What do you understand them to be?

A:  Well, the part affixed to the building which has been
referred to as a channel iron and the projections which are
made of aluminum, the wall itself and the paint which covers
the wall.

Q:  If the projections having been removed and are not, having
not been destroyed, do you think that the work could be
recreated?

A:  Yes, I do.

Q:  And if it were recreated, would it then resume its
existence?  Would that be a fair way to characterize it?

A:  I would say yes.

(Trans. of Mar. 16, 2005, at 256-58.)

On cross-examination, Professor Krauss again testified that

the Work was destroyed, and that it would remain so unless it was

7

recreated at 599 Broadway:

> Q:  Professor Krauss, you testified on direct examination by
> Mr. Altman that the Myers work at 599 Broadway can be
> recreated.  I want to ask you this:  Can it be recreated at
> another site?
>
> [ . . . . ]
>
> A:  I don't believe it could be.  And when I said it could be
> recreated, I'm not an engineer, so that's not expert testimony
> by any -- by any means.  But I don't believe it could be
> recreated at any site.
>
> Q:  So, it is your view that unless it is recreated at this
> particular site, it is destroyed?
>
> A:  Yes.

(Id. at 263-64.)

It would appear that Defendant Myers' theory is that while the

Work is "destroyed" for the time being, it is capable of being

"recreated," and therefore is not destroyed for purposes of VARA.

Counsel for Defendant Myers concedes that this type of

ephemeral destruction is not contemplated by VARA:

> I'm not asking your Honor to rule in Mr. Myers' favor
> out of sentimentality, it is protected by the Visual
> Artists Rights Act . . . because even though it is a
> situation which VARA does not specifically contemplate,
> I believe it, nonetheless, should fall under its
> protections . . . Now when VARA talks about removabi-
> lity it doesn't really talk -- it really contemplates
> the notion of let us, say, a painting hanging on a wall
> or a sculpture which is bolted to the floor of the lobby
> of an office building, something like that.  This is not
> what we have here.

(Trans. of Mar. 15, 2005, at 27-28.)  Yet, even after conceding

that VARA does not contemplate this type of artwork, Defendant Myers asks the Court to find that Defendant Myers' rights are nevertheless protected by VARA.

Congress, in enacting VARA, made a distinction between "removal" and "destruction" and how either "removal" or "destruction" affects the rights of an artist under VARA. The statute does not formally define "removal" and "destruction" and instead relies on the common, everyday meaning of these words. The Court defined the meaning of "remove" in Board I as "[t]o move from a position occupied . . . [t]o convey from one place to another." 2003 WL 21403333, at *10. The word "destroy" is defined as "to tear down or break up." *American Heritage Dictionary of the English Language* (4th ed. 2000). The definition of "remove" implies that the object being removed has retained its physical integrity; a "destroyed" object clearly has not.

Counsel for Defendant Myers provides no support for his attempts to state that artwork that is "destroyed" but capable of being "recreated" is not "destroyed" for the purposes of VARA, 17 U.S.C. § 113(d)(1). It would seem that his "clarification" or "definition" of what constitutes "destruction" under the statute would render meaningless the distinction Congress made in enacting 17 U.S.C. § 113(d)(1)-(2). And indeed, the words "disband" and "recreate," used by Defendant Myers and Prof. Krauss, support the

conclusion that the Work is destroyed.  The definition of "disband" is synonymous with "destroy":  "to dissolve the organization of . . . to break up".  The word "recreate" is defined as "to create anew," *American Heritage Dictionary of the English Language* (4th ed. 2000).

Indeed, the Work has undergone two substantial changes since it was first erected in 1973.  In 1981, Defendant Myers repainted the Work with a new color scheme.  (Pl.'s Ex. ("PX") 60.)  In 1997, the Commission approved the "interim removal of unstable steel braces, along with the attached projecting sculpture," which resulted in the removal of the easternmost row of braces.  (PX 70.) These are two significant changes to the "original" Work as conceived of and created by Defendant Myers.[7]  The Work has

_____

[7]  The 1981 repainting of the Work with a new color scheme would seem to be the first "destruction" of the Work.  There is no question that Thomas Gainsborough's painting *The Blue Boy* would not be the same painting if later the boy's clothes were painted red.  The 1997 permanent removal of the easternmost braces would also seem to be a "destruction" of the Work.

17 U.S.C. § 106A(c)(2) excepts from the definition of destruction, distortion, mutilation or other modification, "any modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement."  However, the two changes to the Work, repainting, and the removal of the braces, were not the result of conservation, nor did they come about because of any public presentation of the Work.  The repainting of the Work had nothing to do with its conservation, or with the lighting or placement of the Work.  The second change, the 1997 removal of the braces, involved the functional role of the building wall as support for

10

metamorphosed from its original form as visualized and conceptualized by Defendant Myers, from the time it was first installed, to its incarnation if it were to be reinstalled, so that it would not be the original Work if it were to be put back on the wall of any building, including that of 599 Broadway.

Based on these previous changes to the Work, and the terminology used by Defendant Myers and Prof. Krauss to describe the current state of the Work ("disband" and the ability to be "recreated"), as a matter of law, the Court finds that the Work falls within the ambit of 17 U.S.C. § 113(d)(1) and not § 113(d)(2). If the previous changes to the Work were not sufficient to cause its "destruction, distortion, mutilation, or other modification," the complete removal of the Work from the wall has certainly caused the "destruction, distortion, mutilation, or other modification" of the Work. 17 U.S.C. § 113(d)(1). Despite the attempts of Defendant Myers and Prof. Krauss to qualify their answers by saying the Work could be recreated even though now it does not exist, the Court finds that the Work is disbanded, as Defendant Myers and Prof. Krauss stated, and hence, it is destroyed.

---

the building. The braces were removed not to protect the Work or preserve the artistic integrity of the Work, but to preserve the stability of the building wall itself.

Defendant Myers consented to the installation of the Work on the wall of 599 Broadway before the effective date of VARA, as counsel for Defendant Myers conceded at trial.  (<u>See</u> Trans. of Mar. 18, 2005, at 325.)  Accordingly, the Court declares that Defendant Myers has no rights under the Visual Artists Rights Act to block or otherwise object to the permanent removal of the Work from Plaintiff's building.  Judgment is granted to Plaintiff on its VARA claim against Defendant Myers.  Defendant Myers' counterclaim based on VARA is dismissed with prejudice.

## II.   Fourteenth Amendment Takings Argument

In Board III, the Court found that it was precluded from granting summary judgment on the takings cause of action to either Party because the Parties had not proffered any evidence on the ownership of the Work, which the Court found to be a genuine issue of material fact.[8]  <u>See</u> 2004 WL 19825250, at *19-20.  The determination of ownership has a direct impact on the takings analysis to be applied to the situation at hand, namely whether the Court should analyze the case as a physical occupation, or whether it should apply the test appropriate for economic regulations.  The

------

[8]  Any determinations in prior Opinions based on ownership noted that there was nothing before the Court at that time to establish ownership.  Discovery for trial revealed documents and information not previously available to the Court.

12

takings analyses are discussed in detail in Board III.  <u>See</u> 2004 WL
1982520, at *16-18.

Plaintiff states that it does not own the Work, and that title
has always remained with City Walls, Inc. ("City Walls"), the non-
profit organization that played arguably the most significant role
in the installation of the Work on 599 Broadway.[9]  City Defendants
dispute this contention and argue that the owners of 599 Broadway
have owned the Work from the time it was installed, and if not
since then, then certainly after City Walls ceased to function or
exist as a corporation.

A.  Plaintiff's Exhibit 53

Plaintiff's Exhibit ("PX") 53 is a signed letter dated October
19, 1973 from Charles J. Tanenbaum, the owner of 599 Broadway at
the time the Work was created, to Doris Freedman, President of City
Walls.  The letter states in pertinent part:

> I understand that by virtue of the terms of the consent
> granted by the Board of Estimate, as well as the Agree-
> ment of Acceptance which you executed, that you cannot,
> at this time, follow your normal practice of conveying
> title to the completed work of art and that you may thus
> continue subject to certain residuary liability.

(PX 53.)

─────────────────

[9]  City Wall's involvement in the subject of this litigation
is discussed in Board I.  <u>See</u> 2003 WL 21403333, at *2-4.

13

PX 53 speaks for itself.  City Walls had title to the Work.
That title was never conveyed to Mr. Tanenbaum because of the
restriction contained in the Board of Estimate Resolution, which
restricted conveyance of the title to the Work without the Board of
Estimate's consent.[10]

There are no other documents before the Court that counter PX
53, and City Defendants, despite their objections to it, offer no
evidence to rebut PX 53.  They instead argue that the Court should
rely on Mr. Tanenbaum's explanation of his intent in writing PX 53

_____

[10] City Defendants state that the Court misconstrued the
Board of Estimate Resolution ("BOE Resolution") in Board I when
the Court stated that because of the BOE Resolution, "the grantee
City Walls could not transfer title to the work."  2003 WL
21403333, at *4.  City Defendants argue that the BOE Resolution
merely gave permission to City Walls to allow projections from
the building over a city sidewalk and since the BOE and the City
did not own or have title to the Work, the BOE could not prohibit
transfer of title.  (City Defs.' Mem. of Law II at 7-8.)

It is the City Defendants who misconstrue the BOE
Resolution.  The BOE Resolution gave consent to "City Wall, Inc.
to erect an artistic creation involving various projections over
the city sidewalk on the north wall of the building known as 599
Broadway, . . . ."  (PX 18 at 2.)  The BOE, in giving this
consent, stated that "[t]his consent is for the exclusive use of
the grantee and solely for the purpose hereinabove mentioned and
shall not be assigned either in whole or in part, or leased or
sublet in any manner, nor shall title thereto, or right, interest
or property therein pass to or vest in any other person, firm or
corporation . . . without the consent in writing of The City of
New York, acting by the Board of Estimate."  The BOE Resolution
made clear that the consent granted to City Walls would not
necessarily be granted to the next owner of the Work.

14

to find that PX 53 does not determine ownership of the Work.[11]

On the witness stand, Mr. Tanenbaum, an attorney, repeatedly stated that he held title to the Work.  When the Court stated to Mr. Tanenbaum that it was not clear to the Court how PX 53 demonstrated that Mr. Tanenbaum had title, Mr. Tanenbaum explained:

> If I had realized that was what has happened subse-
> quently, I would have said I want you to confirm that
> I have title.  But at that point it was so clear to me
> that I have title that I ignored this as basically her
> explanation of why she wanted an answer to the letter.

(Id. at 121-22.)

City Defendants state, "Mr. Tanenbaum is intelligent and straightforward."  (City Defs.' Mem. of Law II at 11.)  The Court did find that Mr. Tanenbaum's testimony on other matters was "straightforward;" however, his testimony concerning PX 53 was less so.  Mr. Tanenbaum attended Yale Law School.  (Trans. of Mar. 15, 2005, at 31.)  He testified that he had practiced real estate law in the past "because the family had been in real estate for several generations and . . . I worked on real estate matters."  (Id. at 32.)  As a lawyer, not a layman, and particularly one familiar with

---

[11]  Mr. Tanenbaum stated that he understood the sentence in PX 53 about City Walls' inability to convey title as Doris Freedman being "afraid that because of her having put it up, she might have some further liability."  (Trans. of Mar. 15, 2005, at 119.)  According to Mr. Tanenbaum, PX 53 was his response to Doris Freedman's concerns about liability, by giving her everything she needed other than indemnification.  (Id. at 123.)

15

real estate law, Mr. Tanenbaum understood the legal significance of the term "title".  His explanation to the Court why he ignored the reference to "title" in PX 53 when responding to concerns of liability by City Walls is not credible.[12]

Accordingly, the Court finds that the Board of Estimate conditioned its permission to erect the Work on the "applicant" (City Walls) retaining title and that ownership status exists in City Walls to this day.[13]

_____

[12]  **Doris Freedman expressed concerns about liability in another letter dated February 7, 1973 to her attorney at Wilkie, Farr & Gallagher.  In that letter, Doris Freedman states that "This brings to mind the very important fact, that if indeed this Wall ever gets up, what kind of protection does City Walls have in case one of the projections falls off the wall. . . . I told [John Latona of Seaboard] that we could not move one more step unless he verified the safety condition of these steel channels . . . ."  (PX 37.)  Liability is traditionally a concern of an owner.**

[13]  **City Defendants argue that the Work is a fixture, and thus, belongs to Plaintiff as owner of the building.  Although it would seem that PX 53, as an agreement concerning ownership of the Work, precludes this argument, see People ex rel. Interborough Rapid Transit Co v. O'Donnel, 202 N.Y. 313, 319 (1911), Tyson v. Post, 108 N.Y. 217, 221 (1888), J.K.S.P. Restaurant, Inc. v. County of Nassau, 127 A.D.2d 121, 127-28 (2d Dep't 1987), the Court also finds that the Work does not possess the characteristics of a fixture.**

**In footnote 14 of Board III, the Court stated the three criteria for fixtures under New York law:  "(1) actual annexation to the real property or something appurtenant thereto; (2) application to the use or purpose to which that part of the realty with which it is connected is appropriated; and (3) the intention of the party making the annexation to make a permanent accession to the freehold."  2004 WL 1982520, at *19.  The New**

York Court of Appeals has stated that "[t]here is no inflexible and universal rule by which to determine under all circumstances whether that which was originally personal property has become part of the realty as a result of being affixed [to the property] and used in connection [with it]." <u>Interborough Rapid Transit Co.</u>, 202 N.Y. at 318 (1911). The determination of whether a chattel has become a fixture thus is determined on a case-by-case basis. Often, the intention element is considered the chief factor by New York courts, the other two elements' chief value being evidence of such intention, particularly when the other factors are indeterminate. <u>See</u> 2 NY Jur Fixtures § 7; <u>South Seas Yacht Club</u>, 136 A.D.2d 537, 538 (2d Dep't 1998); <u>Snedeker v. Warring</u>, 12 N.Y. 170 (1854).

The Court in Board III did not make a determination of whether the Work constituted a fixture but noted that "it is in dispute whether City Walls intended or expected the Work to be a 'permanent accession to the freehold.'" 2004 WL 1982520, at *19.

An examination of the evidence reveals that the Work meets none of the criteria. The Work was not intended to be a "permanent accession" to the building. The BOE Resolution granted a limited consent to City Walls to maintain the Work: "This consent shall continue only during the pleasure of the Board of Estimate and shall be revocable at any time by Resolution of said, but in no case shall it extend beyond a term of ten (10) years from the date of its approval . . . ." (PX 18 at 2.) Mr. Tanenbaum was also aware of the limitations posed by the BOE Resolution and the impact it had on the permanency of the Work. In PX 53, Mr. Tanenbaum stated:

[T]he owners wish to confirm:

> (a) If the City of New York shall require the removal of this work, we will assume full responsibility for the removal of the portion projecting over the street.
> (b) If the City of New York shall direct specific measures for the maintenance of the project, we, at our option, will either comply with its directions or remove the portions projecting over the street.

17

**B.  City Defendants' Arguments that Plaintiff Owns the Work**

City Defendants offer three arguments in support of their

position that even if City Walls initially had title to the Work,

_____

(Pl.'s Ex. 53.)  This echoed a sentiment Mr. Tanenbaum had made
in an earlier letter where he stated "Further, I am concerned by
the possibility that the permit given to erect these projections
may be revoked at some further date."  (PX 2.)  In that same
letter, Mr. Tanenbaum indicated that removal of the projections
was a possibility.  (Id.)

Rather than the statements made in hindsight by Mr. Tanenbaum
and Defendant Myers, or arguments made by counsel which are not
substantiated by any documents in the record, the Court finds that
the circumstances of the annexation as revealed by the BOE
Resolution and Mr. Tanenbaum's understanding of the temporary
nature of the consent granted by the BOE at the time the consent
was given, demonstrate that the Work was not intended to be a
permanent accession to the building.

The Work also has no application to the use or purpose of the
building.  599 Broadway is organized as a condominium under the
New York Condominium Act.  There is no evidence before the Court
that the Work, as a piece of art placed on the building's wall,
furthers the use or purpose of the building as a commercial
condominium.  City Defendants attempt to argue that New York
courts have found ornamentation or aesthetic improvement to a
building to be a proper use or purpose when determining whether
something is a fixture by citing cases where ornaments were found
to be fixtures.  However, the cases cited are more properly read
as such ornaments constituting fixtures because of the manner in
which they are affixed to the property rather than because they
serve any use or purpose of the property.  See Snedeker v.
Warring, 12 N.Y. 170 (1854) (court found that a statue was
intended to be permanent accession because it was placed on
permanent mount and base); New York Life Ins. Co. v. Allison, 107
F. 179 (2d Cir. 1901) (mirrors that were "so attached as to become
practically integral with the walls" were fixtures).

Finally, although the Work had been annexed to the building,
it no longer is.

it does not anymore, and the Work is now owned by Plaintiff:  (1) abandonment; (2) adverse possession; and (3) that City Walls can not hold title to any property because it is a defunct corporation. Although the Court has found that City Walls owns the Work, it will nevertheless address these arguments.

    1.    Abandonment

City Defendants argue that even if the Court finds that the title to the Work was never conveyed to Plaintiff, title rests with Plaintiff because previous owners of the building took possession of the Work after City Walls abandoned the Work when City Walls ceased to operate in 1977.

As Plaintiff's counsel stated in his closing argument, the standard for finding abandonment is very high.  "Abandonment of property requires a confluence of intention and action by the owner.  Accordingly, before possessory rights will be relinquished, the law demands proof both of an owner's intent to abandon the property and of some affirmative act or omission demonstrating that intention."  <u>Hoelzer v. City of Stamford</u>, 933 F.3d 1131, 1138 (2d Cir. 1991).

City Defendants argued both during the trial and in their post-trial memoranda that City Walls abandoned the Work.  According to City Defendants, "the sculpture was abandoned . . . when City Walls went out of existence, and . . . the title of the abandoned

19

property is then passed to the first person who [sic] possession of it." (Trans. of Mar. 18, 2005, at 320.) The ceasing of operations of City Walls cannot be construed as a deliberate intention by City Walls to abandon its title to the Work. No evidence is before the Court that would demonstrate any deliberate or intentional "throwing away" of the Work by City Walls.

   2. Adverse Possession

   City Defendants also raise for the first time in their closing statement the argument that Plaintiff owns the Work by the doctrine of adverse possession. This alternative argument made by City Defendants is unusual. In the first instance, the Court was not able to find another case where a party not claiming to be the owner is attempting to foist ownership through the operation of adverse possession on another party who disclaims ownership. Adverse possession is a remedy not favored by the courts but used as a mechanism to quiet title of property that is in dispute. See Belotti v. Bickhardt, 228 N.Y. 296, 308 (1920) ("Adverse possession, although not a favored method of procuring title, is a recognized one. It is a necessary means of clearing disputed titles . . . ."). In all the cases found by the Court, the person raising the doctrine of adverse possession uses it either offensively to quiet title to him or her or defensively against someone claiming superior title to the property. In either case,

the person claiming adverse possession is seeking title or ownership to the object at issue. The Court was unable to find a case in which adverse possession was used as a weapon to impress ownership upon an unwilling owner, as is the case here. Nevertheless, the Court will address City Defendants' adverse possession argument.

In order to establish adverse possession in New York, a claimant must show each of the following elements: possession that is (1) hostile and under a claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous. See Gache v. Town/Village of Harrison, 813 F.Supp. 1037, 1052 (S.D.N.Y. 1993). "Since the acquisition of title to land by adverse possession is not favored under the law, these elements must be proven by clear and convincing evidence." Ray v. Beacon Hudson Mt. Corp., 88 N.Y.2d 154, 159 (1996). All five elements are essential to succeed in a claim of adverse possession. Belotti, 228 N.Y. at 302; see also State of New York v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 255 (2002) (noting that in the cases cited by a party where adverse possession was not found, "private claimant did not satisfy one or more of the elements of adverse possession").

The doctrine of adverse possession also applies to claims of ownership of personal property. See Lightfoot v. Davis, 198 N.Y. 261, 267 (1910); see also 2 N.Y. Jur. Adverse Possession and

Prescription § 86.  The standards for adverse possession of real and personal property are the same; adverse possession of personal property must also be "actual, open and notorious, exclusive, hostile, under claim of right, and uninterrupted for the statutory period."  <u>Rabinoff v. United States of America</u>, 329 F.Supp. 830, 841 (S.D.N.Y. 1971).  The statutory period in New York for adverse possession of personal property is three years.  <u>See</u> New York CPLR § 214(3).

> a.  Actual Possession

As a preliminary matter, the adverse possessor must <u>possess</u> the property.  <u>See</u> 2 NY Jur Adverse Possession and Prescription § 10 ("Possession is an indispensable element in the acquisition of title by adverse possession."); <u>see also</u> 2 CJA Adverse Possession § 34 ("Actual possession of some part of the land claimed is an indispensable element of adverse possession.).

It is not clear how any private individual can "possess" a public work of art.  "Possession" is defined as "[t]he fact of having or holding property in one's power; the exercise of dominion over property . . . [t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object."  *Black's Law Dictionary* (8th ed. 2004).  Possession does not presuppose ownership.  Ownership is defined as "[t]he bundle of

rights allowing one to use, manage, and enjoy property, including the right to convey it to others.  Ownership implies the right to posses a thing, regardless of any actual or constructive control." Id.  For example, a tenant possesses the right to use an apartment to the exclusion of others, except the owner/landlord.  It is not clear to the Court how one can possess the Work in the legal sense when the Work was created for and made accessible to everyone.

Without discussing the public nature of the Work, City Defendants argue that Plaintiff possessed the Work because it "has clearly been on the building side for 32 years."  (Trans. of Mar. 18, 2005, at 321; City Defs.' Mem. of Law II at 17.)  This fact alone does not prove that Plaintiff possessed the Work.  Since the Work was first created in 1973, it was installed on Plaintiff's building wall.  City Defendants present no other argument or evidence of actions by Plaintiff that would demonstrate actual possession by Plaintiff of the Work, other than the fact that the Work is on Plaintiff's property.  Hence, City Defendants have failed to establish actual possession by clear and convincing evidence.[14]

City Defendants do make the argument that Plaintiff

---

[14]  City Defendants, and not Plaintiff, the purported adverse possessor, bear the burden of proof because they seek to show that Plaintiff own the Work through adverse possession.

23

"exclusively exercised all rights of ownership over the sculpture
-- insuring, repairing and maintaining it." (City Defs.' Mem. of
Law II at 17.)

However, the exercise of these rights by Plaintiff also does
not establish actual possession by clear and convincing evidence.
The Court first notes that insuring, repairing and maintaining
property are not necessarily the hallmarks of ownership.  For
example, a tenant may covenant with his or her landlord to make
certain repairs to the property, or have other conditions imposed
on the tenancy while ownership still rests in the landlord.  <u>See</u> 74
N.Y. Jur Landlord and Tenant § 210.  In this case, Mr. Tanenbaum
assumed certain responsibilities for the Work, as stated in PX 53,
Mr. Tanenbaum's letter to Doris Freedman.  Specifically, in that
letter, Mr. Tanenbaum confirmed, as owner of the building:

  (a) If the City of New York shall require the removal
      of this work, we will assume full responsibility
      for the removal of the portion projecting over the
      street.
  (b) If the City of New York shall direct specific
      measures for the maintenance of the project, we,
      at our option, will either comply with its directions
      or remove the portions projecting over the street.
  (c) We will not look to you for any further expenditures
      of any kind, although we hope you will cooperate
      if it becomes necessary to apply for the renewal of
      this permit.
  (d) We maintain liability insurance in limits of
      $1,000,000 as to persons and property, and will be
      willing to add your name as additional insured at any
      time if this can be done without additional premium.

24

(PX 53).  Any maintenance or insurance of the Work did not mean

that Plaintiff, or any preceding building owners, possessed the

Work because such responsibilities were explicitly taken on in PX

53, a document which also confirmed that City Walls had title to

the Work, and not the owner of 599 Broadway.

In addition, any maintenance by Plaintiff of the Work as

evidenced by applications to the Landmarks Preservation Commission

concerning the Work, resulted from the fact that the Work was on

Plaintiff's property.  Plaintiff was required to apply to the

Landmarks Preservation Commission for any changes it wanted to make

to its building because 599 Broadway is within the SoHo-Cast Iron

Historic District.  Any changes or repairs it desired to make to

the building wall necessarily included changes to the Work.  Under

these circumstances, it cannot be said that Plaintiff's maintenance

of its wall and the Work constitutes clear and convincing evidence

that Plaintiff had actual possession of the Work.[15]

      b.  Open and Notorious

Possession must also be open and notorious so that the true

_____

[15]  City Defendants also argue that Plaintiff included a
description of the Work in legal documents included as Defs.' Ex.
("DX") V-1, W-1 and U-1 without referencing specific pages.  The
Court's own review of these legal papers, namely the Condominium
Declaration, the Offering Plan and Title Insurance for
Plaintiff's building, reveals no specific reference to the Work.

owner and others in the community are given notice of the adverse possession.  See Ray v. Beacon Hudston Mt. Corp., 88 N.Y.2d at 160; 2 CJS Adverse Possession § 54.

City Defendants reiterate their argument that possession of the Work is open and notorious because the Work is on the side of Plaintiff's building and Plaintiff has maintained and insured it. However, for the same reasons stated by the Court above, City Defendants have failed to prove open and notorious possession by Plaintiff.  The Work, from its creation, occupied the wall of 599 Broadway and remained there until it was removed for repair work to be done to the wall.  The location or "possession" of the Work did not change from the time the title holder had it placed on the wall until it was removed.  The continued placement of the Work on the building wall could not then be the kind of open and notorious possession necessary to provide any notice of an adverse claim of the Work by Plaintiff to either City Walls or the public.

c.  Hostile and Under Claim of Right

"The hurdle that defeats most claims of adverse possession is that of hostility.  This requirement, which is governed by an objective standard, leaves absolutely no room for equivocation. The initial entry on the property must be under a claim of absolute right without recognition or deference to the interest or rights of any other."  In re Haynes, 283 B.R. 147, 151 (S.D.N.Y. 2002)

Adverse use is presumed if the elements of open, notorious and continuous possession are proven.  <u>Pirman v. Confer</u>, 273 N.Y. 357, 363; <u>West v. Tilley</u>, 33 A.D.2d 228, 231 (4th Dep't 1970) (citing <u>Belotti v. Bickhardt</u>, 228 N.Y. 296, 302 (1920)).  However, "where the possession is permissive in its inception, its character will be changed to adverse, so as to permit the running of the statutory period <u>only when</u> the possessor evinces a claim of ownership by some tangible act in hostility to the rights of the real owner." <u>Rabinoff</u>, 329 F.Supp. at 841 (S.D.N.Y. 1971) (emphasis added); <u>see also</u> <u>In re City of New York</u>, 307 N.Y. 447, 458 (1954) ("When the entry upon land has been by permission or under some right or authority derived from the owner, adverse possession does not commence until such permission or authority has been repudiated and renounced and the possessor thereafter has assumed the attitude of hostility to any right in the real owner.").

Counsel for City Defendants argues that the hostility element has been met because:  (1) Mr. Tanenbaum believed he owned the Work and this belief made his claim hostile; and (2) the claim is hostile even if Mr. Tanenbaum erroneously believed he owned the Work.  (Trans. of Mar. 18, 2005, at 321-32; City Defs.' Mem. of Law II at 17-18.)

City Defendants' argument that the hostility element is met

because Mr. Tanenbaum believed he had title, even if it was a mistaken belief, is without merit. A mistaken belief of ownership is only presumed to be hostile when the elements of open, notorious and continuous possession have been established by clear and convincing evidence. Such is not the case here.

Even if actual, open and notorious possession of the Work had been met by Plaintiff's maintenance and insurance of the Work, these responsibilities were initially taken on with the permission of City Walls. (See PX 53.) Therefore, any "possession" of the Work by Plaintiff through the continuation of obligations undertaken by Mr. Tanenbaum in PX 53 began as permissive and Plaintiff has not made any "tangible act in hostility" that would convert permissive possession into adverse possession.[16] Accordingly, the Court finds that the hostile and under-claim-of-

---

[16] City Defendants have made the argument many times that Plaintiff is bound by earlier "admissions" that they owned the Work.

Plaintiff may have initially thought that it owned the Work, or may have, as Plaintiff's counsel states, made such representations as part of its legal arguments. Regardless of Plaintiff's initial belief and basis for its belief, the Court, after reviewing the many submissions in deciding two separate motions for summary judgment, found that the issue of ownership was a disputed issue of material fact. This conclusion by the Court has been further supported by the most recent discovery by the Parties on the issue of ownership. That discovery has uncovered evidence which demonstrates that Plaintiff did not ever own the Work, and does not presently own the Work.

right prong has not been satisfied.

        d.  Exclusive

   Exclusive possession is defined as follows:

> This requirement means that the claimant must not share his
> possession with anybody other than one to whom he gives
> permission to use his land.  As is true with several of the
> other requirements of adverse possession, the purpose of the
> exclusiveness requirement is to put the true owner on notice
> of the claimant's adverse possession of his land.  Whether or
> not the claimant's possession of the true owner's land was
> exclusive is often determined in light of the nature of the
> land, its uses, and the purposes for which it is naturally
> adapted.  The intention of the claimant in holding the land,
> as evidenced by his statements and acts, must also be
> considered.

39 AmJur POF 2d 261, § 6.  "Use or occupation in common with third

persons or the public generally is not exclusive possession."  2

CJS Adverse Possession § 60.  <u>See also</u> 56 A.L.R.3d 1182 ("Courts

which have dealt with the question whether one can acquire title by

adverse possession to land which has been used by the public . . .

have held that no title can be acquired if the public use indicates

a claim of common or public right.  The rationale most frequently

relied upon has been that public use has destroyed the element of

exclusiveness necessary for the acquisition of title.").

    During City Defendants' closing argument, the Court asked

counsel for City Defendants:  "How is it exclusive?"  (Trans. of

Mar. 18, 2005, at 321.)  Counsel for City Defendants never answered

29

this question posed by the Court either in her argument or in her post-trial briefs.

While City Walls held title to the Work, it did not intend to nor did it ever exercise exclusive possession over it. It was conceived as a public work, with open and equal access to it for all from the beginning:

- "The Project is not for private use, but is intended as an artistic creation to beautify the city and to enhance public awareness of art in the city." (City Wall Petition to the Board of Estimate, DX M.)

- "We are writing to you at the suggestion of Forrest Myers who has been working with us for over a year on an extremely exciting and innovative public art project." (Letter from Doris Freedman to various prospective donors on December 1, 1972, PX 5.)

- "I was therefore delighted when I was approached by City Walls Inc. . . . for a public art project for this wall, designed by Forrest Myers." (Letter from Charles Tanenbaum to Mr. Donald M. Oenslager, Art Commission, City Hall on January 19, 1973, PX 11.)

- "It is a historical landmark in the field of public art." (Letter from Susan Freedman, director of the Public Art Fund to Stanley Riker, PX 59.)

- Altman's opening statement: "This work has become a part of the fabric of Soho and it has really become a piece of public art in the truest sense. It is really owned by everyone. It has been known by everyone. It has been widely publicized." (Trans. of Mar. 15, 2005, at 27.)

- Dr. Krauss' testimony: "I was just very happy that there should be this public work of art in this area that I was —

30

> that I had a great affection for.  It seemed to me somehow a
> kind of announcement about the nature of that district of New
> York."  (Trans. of Mar. 16, 2005, at 251.)

(emphases added).  Since the original owner never possessed it

exclusively, no subsequent owner claiming from him can.

Plaintiff is a private entity, and not a non-profit

corporation whose purpose is to provide art to the public.  In

Plaintiff's case, exclusive possession would require that it

successfully take away public access to the Work, which under these

circumstances, would pose an insurmountable task.

City Defendants have not set forth sufficient evidence that

there was actual, open and notorious, hostile, and exclusive

possession of the Work by Plaintiff.[17]  Accordingly, the Court finds

that adverse possession has not been and cannot be established by

clear and convincing evidence.

3.  City Walls' Ability to Hold Title to the Work

City Defendants' final argument that Plaintiff, and not City

Walls, owns the Work is based on their assertion that City Walls is

not able to hold title to the Work.

City Walls was incorporated under the laws of the State of

_____

[17]  Because the Court finds there has been no actual, open
and notorious, hostile or exclusive possession, the Court does
not address the "continuous for the statutory period" element of
adverse possession.

Delaware, (PX 88), and was authorized to do business in New York State.  (PX 89 at 2.)  Doris Freedman passed away in 1981.  (Susan Freedman Aff. ¶ 2.)  No evidence is before the Court that City Walls as a corporation was formally dissolved.[18]

PX 96 is a certificate issued by Harriet Smith Windsor, Secretary of State of the State of Delaware stating that City Walls is no longer "in existence and good standing under the laws of the State of Delaware having become inoperative and void the first day of March, A.D. 1984 for non-payment of taxes."  In PX 97, the Secretary of State of the State of New York certifies that upon a diligent examination of the corporate index, no certificate, order or record of a dissolution was found and that according to the Department of State's records, City Walls "is an existing corporation."

---

[18]  City Defendants argue that City Walls was "deliberately terminated in 1977,"  two years before Doris Freedman slipped into a coma.  (City Defs.' Mem. of Law II at 13.)  City Defendants base this on a rather equivocal statement made by Susan Freedman in her trial affidavit: "Although I am not sure of the exact date, City Walls, Inc. ceased to exist before the [Public Art Fund] was founded [in May 1977]."  (Susan Freedman Aff. ¶ 7.)  This unsubstantiated statement by Susan Freedman (i.e., no documents indicating that City Walls was every formally dissolved, such as a certificate of dissolution), who elsewhere states that she was 15 years old in 1973 and thus had "no personal knowledge of the facts and circumstances surrounding the installation of the sculpture created by Forest [sic] Myers . . .",  (Id. ¶ 3), is not conclusive evidence that City Walls was terminated in 1977.

"Corporate existence and the capacity of a corporation to sue or to be sued are governed by the laws of the state of incorporation." <u>Sevitz v. McKiernan-Terry Corp.</u>, 264 F.Supp. 810, 812 (S.D.N.Y. 1966). Under Delaware law, a corporation which has been proclaimed forfeited "for non-payment of taxes is not completely dead. It is in a state of coma from which it can be easily resuscitated, but until this is done its powers as a corporation are inoperative and the exercise of these powers is a criminal offense. It still can serve as repository of title and as obligor of debt." <u>Wax v. Riverview Cemetery Company</u>, 24 A.2d 431, 436 (Del. Super. Ct. 1942); <u>see also</u> <u>Frederic Krapf & Son</u>, 243 A.2d 713, 715 (Del. Sup. Ct. 1968).[19]

_____

[19] City Defendants state that Plaintiff's claim that City Walls continues to exist and hold title to the sculpture is "factually and legally wrong."

City Defendants appear to base this argument on their claim that City Walls has been dissolved, although it has not filed a certificate of dissolution. (City Defs.' Mem. of Law II at 13.) City Defendants provide no support for this argument.

"Dissolution" of a corporation is a specific legal term and is not the legal equivalent of a corporation declared inactive for non-payment of franchise taxes. The procedures for dissolution in Delaware can be found in 8 Del. C. § 275. Nowhere in Delaware's General Corporation Law, or its Corporation Franchise Tax Law, is a corporation whose charter has been forfeited for non-payment of taxes, referred to as dissolved. It is consistently referred to as void. <u>See</u> 8 Del. C. §§ 312-13, 510. Moreover, Delaware statute specifically mandates that a corporation cannot be dissolved or merged until all due or assessable franchise taxes have been paid. <u>See</u> 8 Del. C. § 227.

Although City Walls no longer functions as an independent

_____

There has been no declaration of dissolution of City Walls by
City Walls or any other entity.  Hence, AmJur2d Corporations §
2892, cited by City Defendants for the principle that the
dissolution of a corporation terminates its power to hold
property, does not apply.

       City Defendants also argue that Plaintiff errs in relying on
Wax v. Riverview Cemetery because Wax and Frederic Krapf are
based on the rights of a corporation to wind down its business
during a three-year period under § 278 of the Delaware Charter.
(City Defs.' Mem. of Law II at 14-15.)  However, a careful
reading of these cases reveal that they are not based on rights
of a corporation winding down its business.

       The Wax court addressed this three-year "winding-down"
period only when it explained a Supreme Court case which held
that the three-year period did not include a corporation whose
charter was proclaimed forfeited by the Governor for non-payment
of taxes.  24 A.2d 431, 433-34.  Wax itself did not have anything
to do with the rights of a corporation to wind down its business
during the statutory three-year period.  The question in Wax was
whether a corporation that had forfeited its charter for non-
payment of taxes could be a defendant in foreclosure proceedings.
The corporation in Wax had forfeited its charter in 1924, almost
twenty years before the Delaware court's decision.  The Wax court
answered the question in the affirmative.  In coming to its
conclusion, the court discussed the Franchise Tax Act, which it
noted, had previously imposed a two-year time limit on a
corporation to be reinstated after a forfeiture, and also noted
that these time limits were abandoned in 1927.  The current
version of this provision, found in Delaware's General
Corporation Law also does not set time limits on a corporation's
ability to renew, revive, extend and restore its certificate of
incorporation.  See 8 Del. C. § 312, 313 (2005).

_____Nor can the Court decipher why City Defendants argue that
Krapf is based on the right of a corporation to wind down its
business pursuant to § 278 of the Delaware Charter when the case
makes only one brief mention of this provision when it dismisses
an argument by one of the parties as without merit.  243 A.2d at
715.

entity, according to Delaware law, it is not "completely dead" and is able to hold title to property. Accordingly, City Walls remains the owner of the Work.

Having considered all of the City Defendants' arguments, the Court finds that Plaintiff does not own the Work. City Walls had title to the Work from the time it was first installed on the wall, and title was never transferred to Plaintiff.


C.  Takings

The Court undertook a thorough analysis of the Takings Clause in Board III. 2004 WL 1982520, at *16-20. As the Court stated in Board III, "Ownership . . . plays a crucial role in determining the nature of government conduct in physical occupation cases. If the physical occupation belongs to a third party, it is a direct physical takings to which a per se rule is applied." Id. at 18. In such a situation, the government has a categorical duty to compensate the owner, even when the government does not physically take possession but instead only authorizes a third party to occupy the owner's property. Id.

The Supreme Court has described a permanent physical occupation of one's property by the government, or by authorization of the government, as "the most serious form of invasion of an

owner's property interests . . . [T]he government does not simply take a single strand from the bundle of property rights: it chops through the bundle, taking a slice of every strand." Loretto v. Teleprompter Manhattan CATV Corp, 458 U.S. 419, 435 (1982) (citations and internal quotations omitted). These property rights are composed of the rights to possess, use and dispose of the property. Id. "To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights." Id.

Although this Court has resolved the issue of ownership, there is currently no permanent physical occupation of Plaintiff's property because the Work was removed in 2002, subsequent to the Commission's granting of a Certificate of No Effect on August 27, 2002, which allowed Plaintiff to remove the Work in order to conduct repairs to the building wall. To date, the Work has not been reinstalled.

However, according to the Certificate of No Effect, Plaintiff must reinstall the Work with fabricated lightweight replicas of the Work after the building wall is repaired. (PX 74.) If the Work is reinstalled on Plaintiff's building, Plaintiff will have its rights to possess, use and dispose of its property taken away. By the Commission's decision, Plaintiff will not be able to use its wall

36

in any way other than as a mount for the Work; even if it could sell the property, "the permanent occupation of that space by a stranger will . . . empty the right of any value, since the purchaser will also be unable to make any use of the property." Loretto, 458 U.S. at 436. Accordingly, the Court finds that should the Work be reinstalled, since Plaintiff does not own the Work, that reinstallation would be a permanent physical occupation, and therefore, a taking of Plaintiff's property. The reinstallation of the Work will cause Plaintiff to suffer an unconstitutional physical takings for which it will be entitled to "just compensation."

The issue of compensation is not before this Court because the taking of Plaintiff's property has not yet occurred.[20] Plaintiff has attempted to argue that damages should be granted to it because

---

[20] Plaintiff has never contested that the prior installation of the Work was an unconstitutional taking of its property. In the Complaint, Plaintiff stated that by the Commission's most recent decision compelling Plaintiff "to restore the mural or replicate it with different materials . . . , the Commission is compelling Plaintiff . . . to accept a physical occupation of a portion of their real property without compensation. Therefore the Commission's actions violate the Fifth Amendment's proscription against the taking of private property . . . ." (Compl. ¶ 65(b).)

Prior to the most recent Certificate of No Effect in 2002, the Commission never declared that the Work must remain on Plaintiff's wall. In 1997, the Commission approved the interim removal of braces. However, that permit did not require the reinstallation of the braces. Board I, 2003 WL 21403333, at *5.

it has been unable to use its wall for advertising signage.
However, the Landmarks Preservation Commission never made a
determination on an application by Plaintiff for advertising
signage.  (See PX 70, 74.)  Plaintiff withdrew its application
requesting permission to have advertising signage put up on the
building wall before the Commission made a determination.  (Compl.
¶ 59.)  There are no damages until there is a taking.  There is no
taking unless and until the Commission interferes with Plaintiff's
use of the property in some other way, such as insisting on
reinstallation or preventing the placement of advertising signage
on the building wall.  The Court therefore finds that the issue of
damages is not ripe for judicial review.


                        III.   Conclusion

        For the foregoing reasons, the Court finds that the Work is
destroyed for purposes of VARA and thus Defendant Myers has no
claim under VARA to the Work.

        The Court also finds that Plaintiff does not own the Work.
The Work was never conveyed to Plaintiff from City Walls and City
Walls still retains title to the Work.

        The Court finds that any future reinstallation of the Work on
Plaintiff's property will be a taking in violation of the Fifth

                              38

Amendment, as applied to the states by the Fourteenth Amendment, requiring compensation.

The validity of the Commission's determination to require the Plaintiff to restore the Work is a question not for this Court but for the state courts pursuant to an Article 78 proceeding. The import of this Court's determination is merely that if the Commission prevails, the act of making the Plaintiff keep the Work which it does not own on its building, would be an unconstitutional taking, requiring just compensation to Plaintiff.

The Clerk of the Court is DIRECTED to close this case and remove it from the docket.

SO ORDERED.

DATED:     New York, New York
           May 13, 2005

                              *Deborah A. Batts*
                              _____
                              DEBORAH A. BATTS
                              United States District Judge